and Lewis Age. Is it Age? Age, yes. Okay, all right. Thank you, Mr. McGurk. Mr. Aberly for Lewis Age Jr., who makes two challenges to his conviction for health care fraud in this case. The first one being a challenge to the government's questioning that was intended to convey to the jury that Mr. Age murdered a prosecution witness in order to keep that witness from committing this other crime. The second challenge was that the evidence was not relevant because the government failed to present evidence on a critical component for admissibility of this type of other crimes evidence, and that being evidence that Mr. Age was actually the one who committed this other crimes act. In this scenario, now, in the first trial, did this issue come up? Was this printed? Or this business about the murder, did that come up only in the second trial? That is correct. The first trial, it was simply to mention that a witness, that Mr. Womack had died. Here, in this case, even the government admitted that it had no evidence to present, or to be honest, it wasn't going to present evidence that Mr. Age committed this murder. Nevertheless, it was absolutely necessary for the government to make the jury believe that Mr. Age was somehow responsible. Otherwise, there was no point to this questioning. So what the government did in this case was have the jury connect the dots, and the dots that it made were that Mr. Womack had incriminating testimony to give. Mr. Age tried to bribe Mr. Womack to not give incriminating testimony. Mr. Age then got his good friend and attorney, Hilliard Fezzand, to represent Mr. Womack so that he would steer him in the right direction. That after Mr. Womack decided that he was going to go with another attorney and decided to plead guilty, that Mr. Age learned of that fact, and lo and behold, Mr. Womack ends up dead. Was the jury told that he was actually murdered as opposed to had a heart attack? Yes. And do you ever, is the record site for that in? Yes. It comes up. I had the impression that it was just that they were told that he died right after that, but you're saying they actually used the word murder? The question posed to Mr. Age by the prosecutor was, do you know what happened to him? He was murdered. Okay. So there was an immediate objection? No. I have the actual quotes at my desk, which I'll look, but just to make sure I'm correct here when I come back, but there was no objection to that, but there was an objection to this whole, this, you know, the government said it was going to say what happened to Mr. Womack, and that's what it did, and that included the fact that he was murdered. You said that it was actually Mr. Age in answering the government's question that said Mr. Womack was murdered. Yes. Do you know what happened to him? It's in your brief. Yeah. You know what happened to him? Yes, he was murdered. I mean, the question was asked. I didn't remember that was in the second trial. Yes. Okay. We believe that this is admissible to show consciousness of guilt, but even at its best, this, that type of evidence is somewhat marginal because, you know, anyone who's accused of a crime can arguably have a motive to want to do harm to his accuser. I don't think the government would argue or is arguing, you know, that whole line is probative of what they charged with. Their argument's more or less either it's if they were harmless because of the overwhelming evidence or otherwise it was cured or, you know, sort of that. So I don't think you need to, you know, sort of stay on the point that whether he was murdered wasn't probative of the fraud itself. Right. So there wasn't an objection right at that point, right? There wasn't an objection or request for curative instruction or whatever after the words were uttered. Is that correct? No, there was not. But this whole matter was carefully and in detail taken up in a motion prior to this whole line of questions. It was after direct examination before cross-examination. I get that, but I'm trying to you know, in doing this and yada, yada, yada, that it's so, you know, poisonous that, you know, King's X, trial over reverse. Is that what you're arguing? Yes, because what we have here is a case where the guilt turns pretty fairly largely on the credibility of cooperating criminal defendants. Well, assume for the moment that we were to be of the mind that there's fairly substantial evidence in this record that the jury heard vis-a-vis the indictment on the fraud itself. So just allow for that possibility for the moment. We're not arguing that the evidence was not sufficient. All right. But if, you know, if... So you're saying the prejudicial value of this evidence overwhelms all that. Is that what you're arguing? Exactly. All right. So I'm trying to get you to the point of, you know, what's your best case? I mean, we all know what the rules say, but I mean, what's your best case that given the flow of what transpired that you get a reversal as opposed to us calculating, yes, it shouldn't have come in or was prejudiced or whatever, but it was ameliorated by other factors in the trial and overwhelming evidence. That's why I'm trying to put you to the point because your time has been steadily going here. Well, I think that the answer to the question, though I may not be appreciating it carefully enough, is that we're dealing with a health care case and we have the specter of a murder trial going on overlaying this. How can we judge, how can a jury honestly and fairly judge this man's credibility versus the credibility of the three other criminal witnesses when they have been led to believe that this man is a murderer, number one, and number two, that that murder was motivated by a desire to protect himself from being convicted? We believe that's the prejudice. It's absolutely overwhelming and it prevented the jury from, in the language of. It's so obvious that the attorney didn't even think to object. I mean, that it seems funny to me that this is so in your mind, but that the attorney didn't think to object and allow for some sort of ameliorative instructions or something like that at that point. Well, we have been relying on the fact that this issue was litigated and the defendant lost the ruling prior to this information coming out. And the court is suggesting, I think, that he should have objected again and we would argue then that that wouldn't be necessary at this point. The government said, this is what we're going to do and we're going to culminate, we're, you know, those steps that I laid out before, that Mr. H did this, did this, did this, and we're going to say, we're then going to say, what happened to Mr. Womack? And objection, objection, this is 404B evidence, this is the 403 balancing act, it doesn't come in, the court says it comes in. So we would, our position would be that he, that, you know, they were overruled and it happened and they had to live with that. Overruled in a pre-trial motion. It wasn't a pre-trial motion, it was, it was motioned during the trial between cross-examination and direct examination of Mr. H. Outside the presence of the jury. Yes, and it was a rather heated and lengthy discussion as I recall. But I don't know, does that mean you don't lodge your objection again once the testimony is elicited? Yes, that's what we would argue and I will be happy to try to get the authority for that proposition. What's your best case? I asked you that a while ago. I mean, you know, we know, we all know the horn book, you know, prejudice versus probative value, etc. I'm just saying in a scenario like this where you're saying the government, we got trial number one, this doesn't come up. There's a retrial, trial number two, this is presented, it's presented to the judge, judge says it comes in. It's elicited, answer comes, no objection, no conversation at the bench, no request for curative instruction, I'm assuming, I haven't read the record, but you're saying, you know, it overpowers all the evidence. And I'm just asking you, if you have one, what's your best case that supports the argument you're making that, you know, you get a reversal of the conviction notwithstanding the offense, if you have one? Well, I'm not sure what the probative, what the curative instruction would be given that the judge felt there was no error to begin with. Stay focused on my question. Okay. Not the answer you want to give me. My question is, what is the best case you have that makes the point you want to make in terms of getting the relief you're asking for? I understand your argument. I'm just asking you in the scenario given, what's your best case? When you say case, are you referring to decisions of the court or are you referring to the case I'm trying to make? Because I... Come on, Mr. Abrams. I don't usually have to explain what I mean by what's your best case. I just said, what's your best position? What's the best jurisprudential authority you have from the Fifth Circuit or otherwise that says in a scenario like this, even with prejudice, you get a reversal. I'm not trying to trick you. No, I understand. I'm sincere in my confusion. You have Old Chief from the United States Supreme Court. You've got Beecham. But Beecham is just a boilerplate that tells us how to do the 404B. It's just a hornbook 404B. But again, if there isn't a better case, then that's fine. I'm just trying to hone in once we look at it to see whether or not there is a controlling case or something that we would say based on circuit precedent or Supreme Court precedent that notwithstanding whatever the government may say about overwhelming evidence, this was so pervasive that the conviction should reverse. That's all. I'm just asking. Sure. And I will say that from this position standing here, if I found one, it's in that brief, and I will come back with it. But otherwise, we have Old Chief. And we have the rule, 403. I think here you simply have the balancing act comes in our favor. All right. Thank you, sir. We have your argument. All right. Mr. Jones. May it please the Court, Chief Judge Stewart, Judge Brown, and Judge Haynes. I'm Ernest Lake Jones. I'm here representing Verna Age, who was a co-defendant with Louis Age and who we believe was involved in the case of guilt by association. She was Mr. Age's ex-wife, although she was constantly referred to as his wife during the course of the trial. I want to begin quickly by pointing out that as Mr. Averly was bringing out the matters about the murder, that whole business about the murder contributed widely to the atmosphere of the trial, which worked to the prejudice of not only Mr. Age, but Verna Age as well. The jury was given extra security by court in this trial, which contributed to the atmosphere of dangerous individuals involved in this case. And that too... What has happened with the Womack murder? I don't believe that anybody, to my knowledge, has been charged with the Womack murder. There was a grand jury investigation. None of the people involved in the Age family or on the defense part of the Age's were ever charged with anything. And as far as I know, nothing has happened with it, Judge Haynes. Mr. Averly's brief also speaks to the disqualification of Hilliard Fezzan as counsel. And that is a matter which we believe greatly prejudiced Verna Age. It was that disqualification that led in part to her conviction and the issue that we have today. I'm not sure I understand the connection. I mean, you cite any authority indicating that your client has standing to seek relief based on any violation of Lewis's right to counsel of choice. I'm not sure I understand the connection. It wasn't her counsel. It was not her counsel, but it was going to be a joint defense effort. Mr. Fezzan was an integral part of that, and I myself would not have been a part of the case had not Mr. Fezzan been in his counsel. He had been counsel for the company. He knew all of the players. He had an industry knowledge concerning the home health industry, which I did not have, and Michael Hill did not have. He knew the players. He knew the witnesses. He could find all of the people to come in to testify, and we could not. He was the person best prepared to try this case, and once he was put off of the case, the rest of us had to scramble to meet the court's March 20th, I think it was, deadline. Michael Hill came in, and then I came in, and his absence, I didn't realize at the time how much it was going to affect the trial of the case, but his absence was a factor that carried out throughout the trial, including our inability to get witnesses at the end when the court would not let us call witnesses that had been on the witness list but were not there and told by us that we were going to call them the following day because we, Michael Hill and I, didn't know the involvement and the extent of these people and had not been able to talk to them. The absence of Fezzan worked to Verna Age's detriment to the point not where it's her counsel that was being denied, but it prevented her from making a complete defense to the case, which is a Sixth Amendment guarantee, and to that extent, her Sixth Amendment guarantees were impacted by the fact that Fezzan was not able to participate in her joint defense. Let me ask you about the calculation of the guidelines and the $17 million being used and not reduced for any legitimate services. I have two problems with that argument. One is if you cut that in half, it's still the same enhancement, so it's not as if, wow, if we just showed a million dollars or something of legitimate expenses, we'd be in a different zone. And then the other thing is there was such a huge downward variance that I'm, how can you show this was harmful error even if it was error? Well, the money itself brought up a level enhancement in her. Right, but that was triggered at the $7 million mark, as I understand. It was triggered at the $7 million mark. So you have to show $10 million of legitimate expenses, legitimate services that weren't subtracted for this to make a difference. We're talking about a period of 69 months, Judge, and we believe that that is not beyond the realm of possibility if they are given a fair opportunity to say what was the actual service that was rendered legitimately. What opportunity were you denied? I mean, did you not come to sentencing and say, here's the this or that? I guess I'm not understanding how you were denied a fair opportunity to show that there were some legitimate services. When we came to sentencing, the court had already made the determination that $17 million is the loss in question here. And that was that. There was nothing in the record in which the court said, this is why we think $17 million is the right calculation. This is the opportunity that you get to challenge that. There was no... At sentencing, that's your opportunity. You say, Your Honor, I want to call a witness, or I want to proffer this affidavit, or I want to show you this or that, or let me point out why this is the answer. Why is that not your opportunity? It would have had... Until the sentence is pronounced, there's nothing carved in stone. Even if the judge has announced earlier, I think it's $17 million, the whole point of the sentencing is let's get this out there and let's hear it. There was nothing in the record to support the $17 million. There was nothing in the record for us to attack. In order for us to make the kind of attack that you're speaking about, Judge James, we would have had to go back almost on a case-by-case basis because they only called four patients here. They only talked about interviewing 50 patients out of the thousands that this company, which had been in business since 1992, had served. We only had records in the record about four or five of them. From that, when the court says, this is $17 million, that's the loss impact, it's an incredibly onerous burden from us. I don't think we could have even attacked that at that point because there was no target for us to attack. There was nothing there other than the $17 million figure. You don't know how they arrived at that? No, ma'am. There's nothing in the record other than saying we have reviewed the claims data, and this is all of the claims that this company submitted during the conspiracy period. All of the claims data, I don't believe, was even introduced. There was a summary exhibit introduced, but it wasn't there, and it wasn't there for us to attack. We don't believe that there are any cases in this circuit or any place else in which the government has just been permitted to say, well, because that's the total data, then that's the claims data, and that's all we did. How can you show that it's not harmless error given the fact that your client got such a huge downward variance? That's a big one. Even if we agreed with you and you went down one bracket in the guidelines in terms of levels, it still wouldn't get you to the 60 months you got, so she got a huge benefit. Maybe the judge took into account all of this difficulty with the assessment. If so, he did not say that he took that into account. He did take into account that she wasn't there, not even in the state or working for the company during the entire period of the conspiracy, but he didn't indicate anywhere that he gave anybody any credit for it. We do believe that if properly done, we'll come down to a level where she's got a criminal history of zero points. It's all offense-level points that are giving her this high guideline range to begin with. If properly done, she would come down probably to a 20-month. I still don't follow you. If you don't come forward with the evidence that shows that there were some legitimate billings, and it's your client that would know that, you have the whole pre-sentence investigation period where that's your opportunity to present that. How else is the court supposed to know of? Otherwise, your argument sort of feeds into the government's position that the fraud was so extensive and pervasive that separating the legitimate from the non-legitimate billings were impossible. There's nothing in the record that supports that kind of extensive and pervasive. The government didn't try to put anything in that says it was that extensive or pervasive. All they put in was the claims figure. But you got the pre-sentence report. What amount of loss was shown in global in the pre-sentence? $17.1 million, Judge Stewart, based on the fact that that was the total amount submitted. That was the sum total of the discussion in the pre-sentence. We did challenge that amount in a timely fashion with an objection to the amount in the pre-sentence report and at sentencing. However, we did not bring forward any affirmative proof because we had no target to attack. What do you mean when you say that? I mean by that that since they didn't bring forward any evidence or anything that says this amount is fraudulent and this amount is not, we couldn't attack the fraudulent claims because there were no fraudulent claims specified in the government's presentation. We would have had to do almost a claim by claim for the thousands of claims at the time of sentencing and that simply was not feasible. We'll ask the government, but it still kind of comes back to, I mean it's 17, I mean the government took the position in trying this that the fraud was so extensive, basically the whole deal was a fraud. That there weren't any legitimate services that, I mean, that's the way they tried the case is that between the two from point A to point Z were all these fraudulent claims that were submitted and that's the loss. Now I get your point about, you know, that being out there, but nonetheless that's where they go at it. All right, so if the defense's position is no, no, no, no, no, we still say we're innocent, but at least before the time of the indictment, you know, there was no fraud. So here's 8 million that can't be part of the 17 million dollar calculus. Just I'm stuck on yes, I hear saying there was an objection to the pre-sentence report, but I, it's not, I'm not following that just saying we object, that's too much, but without any kind of a showing in the pre-sentence context, not, you know, in the trial context of challenging the calculation, et cetera. But, you know, it's the government's on us, we'll ask counsel. I know my time is up, but if I can just make this point on that, there was no calculation made and there was no calculation for us to challenge. The only calculation was, what is the total amount that this company has billed during the, during the conspiracy period? So there was nothing for us to challenge and say, no, we've got these many that we can bring forward and show we're legitimate. All right, well, that's a fair point, but it does come back to the point Judge Haynes asked you, you know, given the huge downward departure, I mean, the amount of money, even assuming, you know, it's cut in half or whatever, whatever, you're still sort of at the threshold, but you're saying it's, it's, it's the offense level that, that triggers her big sentence, is that what you're saying? Yes, sir, exactly. The offense level, the base offense level was six. It was the money that, that added 20 points and there was some other enhancements that we challenged as well, but if, if, with a criminal history of zero and a base offense level of six, if the money comes down, her guideline range comes down. Given the gravity of the crime, two trials and what the judge find, do you really think the trial judge would have given her at the low end? You don't have to answer that. I mean, that she would have given her at the low end, all things being equal, to me, it looked like she might have been up for the pardon, but you don't have to answer that. That's, that's, that's speculative on my part, but at any event, we'll put the government to the task on the loss and, and you've saved time for rebuttal. We have your point. Thank you, sir. All right, counsel, let's first deal with this murder business. You tried the case first, you've got wheelbarrows full of evidence, try the case, you know, we get a, you know, what, hung jury, mistrial, whatever. We have trial number two and all of a sudden, we got a murder mystery involved. Did you try the case? No, your honor. Oh, you're happy to say you didn't try the case, right? Okay. All right. That prosecutor has left the government under good terms. Oh, the prosecutor is nowhere to be found. Okay. Well, we just love appellate counsel because they have all the answers to what trial counsel did and why. So, tell us first, seriously, you know, what happened in the trial, second trial, whatever, but just help me at least understand the scenario. Counsel opposite is saying, you know, this, so it doesn't come up in a motion and limited, it doesn't come up in a pretrial, but somewhere as the trial is going along, what the government then profits to the court that it's going to do, help me with the mechanics of how that happened. Yes, your honor. So, right after the defendant testified, there's a discussion, not before the jury. And during that discussion, there's a reference to the prosecutor saying, your honor, they knew that if he testified, this was going to be fair game, something like that. And the judge says, yes, I remember ruling that anything that was relevant and material would come in. We were unable to find that earlier reference in the record, despite an exhaustive search. So, I think that that must have been maybe in a, just not transcribed, but there was some discussion beforehand. So, then the defendant testified, and then they have this conversation where the prosecutor says, your honor, I want to let you know that I'm going to go into this line of questioning. And he previews the line of questioning that he's going to engage in. But his testimony presumably is on the fraud, et cetera, et cetera, right? Well, his testimony is about the fraud, but he very much discusses Womack. And he didn't hire him. In fact, when there was a complaint about Womack, that he was illegally recruiting patients, I fired him. And then it also came back that Womack was then rehired, but Lewis H. still didn't fire him again. So, there was a discussion about Womack, and there was the defendant denying that he was aware that Womack would have anything culpable to say because he said he knew nothing about the legal recruiting that Womack had engaged in for SLHH. So, it was absolutely within the government's right on cross-examination. Remember, this is cross-examination. We did not bring this evidence out in our case in chief to test whether he had tried to influence Womack's testimony. That was classic consciousness. Why bring up the murder? I mean, unless you're trying to imply that he did it. So, Your Honor, we agree that it would have been better for the prosecutor to not go there, to go to the murder. But it's very important to remember that the defendant is the first person who mentioned the murder. So, during the cross-examination, before we get to the ECF notice going out about the guilty plea and his death, the prosecutor asked this question. Ultimately, an attorney from right here in Baton Rouge, Mike Fizer, began representing Mr. Womack, correct? And then, Louis A's response, I have no idea who Mr. Womack's attorney was. I tell you what I do know about Mr. Womack's attorney. He got on YouTube and accused the remaining defendants of murder, which I thought was ridiculous for an attorney to act in such a low way. So, apropos of nothing, the defendant is the one who first mentioned the murder and went far beyond what the prosecutor ever intended to do by actually linking himself to the murder that he was being accused. You're saying that's what triggered the need to go into the sequence and... I'm not saying that that's what triggered the need, but I'm saying that the prosecutor did not then exploit it. The prosecutor did not then say, oh, you were accused of murder, let's talk about this murder. He actually just went on to other questions and then, at the very end, came back and asked very limited questions. Just said... Why does it matter? Okay, so I understand showing about the argument and he was trying to bribe him and all that. I think that's all very relevant. And then the jury might wonder, why is Womack not here? So we have to explain that he died. Why do we have to explain how he died? Your Honor, we're not saying that the prosecutor should have gone there. What we're saying is that it was not prejudicial error, given the way the evidence came in. And the way the evidence came in is that the defendant mentioned the murder first and the prosecutor did not exploit it, asked very limited questions. Nothing new was added by the prosecutor's questions, because the prosecutor, and this is spelled out on pages 49 to 50 of the government's brief, just says, do you know where Womack is today? Defendant answers, I don't know, but he's dead. Do you know how he died? I've heard the story. Can you tell it? He was murdered. When did that happen? I have no idea. And then the defendant says he really has no idea and the prosecutor moves on. So there's never even a temporal link between the ECF notice going out that he was going to plead guilty and that he was later murdered two days later. There's not even that link in the prosecutor's questions, let alone any evidence about the temporal link. So what we're saying is that there was no prejudicial error because of the limited nature of the questioning. This is the only mention of the murder in the entire trial. Nothing in the government's case in chief, and critically, nothing in closing argument. The government does not discuss the consciousness of guilt evidence in any way, and even the bribing or the Pizan's influence, or the murder. So in this very long trial, five days, this is the tiny, tiny mention of the murder. It did not prejudice defendants, especially when you consider the overwhelming evidence of guilt. There are three cooperators, Ayanna Alvarez, the defendant's daughter, a medical director, Dr. Michael Hunter, a patient recruiter. The main point is it wasn't all that prejudicial because it wasn't linked by time. There was just this kind of vague thing about where is he today, oh he was murdered, and that's not linked in the sequencing. Because I thought the murder was like two days after he agreed to plead guilty. It was, but the jury never learned that. That's what's not said. Well that's not said. I mean that is one of our arguments, but more of the argument is that it's the defendant who brought up the murder first. I got that. And so the prosecutor's questions don't add anything, actually. It's very, I mean the two days is what's the most suspicious, I guess, if you're a juror, and you're saying that didn't come up. That the temporal link did not. That was what my confusion was earlier. And we say that on our brief with cites to direct you to more of the closing argument. You can't have a cite to something that didn't happen. Right, but explaining how. The sequencing, the timing is what didn't come up. Didn't come up there. But it's kind of disconnected from any time sequence, and that's the critical piece of that. Yes, Your Honor. And that's why I was confused earlier. And not even in the questioning. That's why I just kind of dropped off with no objection, no curative instruction. Instead it just sort of fades into. It does. It fades and it's never mentioned again. Okay. Looking at the overwhelming evidence of the defendant's guilt, which is. Can I ask you instead about the 17 million enhanced, the 20 point enhancement? What evidence is there of legitimate services? I mean, I'm assuming that we've got all this billings, and that's what comes to the 17 million dollars. You take all these billings. Is every one of these patients, you know, entering marathons and whatever and clearly not the issue? Or I mean, did you all prove that? There is evidence of pervasive fraud. So in addition to the four patients who testified and their doctors, there is Ayanna Alvarez saying, this is how we did business. This happened in the majority of the cases. So while there is evidence that it's pervasive, that it happened all the time, that there were altered forms, in support of the fact that it was at least the majority of the claims, if you look at page 64 of the government's brief, we have three sites. There's to the record 5318, which is Agent Casey's testimony. Record 5351 and 5447, which is Alvarez's testimony. Record 5708, which is Johnson's testimony. All of those record sites support that witnesses repeatedly testified that the majority of the claims were fraudulent. So all you have to do is take 50 percent of the claims and you still get the 20 level increase and you've got that record support for it. The 17.1 million is the claims that were submitted and I think that the claim data was submitted at trial. I don't remember right now. Agent Casey's testimony, which we've cited in our brief when we tell you about the 17.1 million, probably says whether the claims data was submitted. But GX81 was a summary. The defendants obviously had it because they're the ones who created it, right? So is it your position then that they could have gone back through there and said, well, you know, we've provided services to Widow Jones and Widow Jones hasn't left the house in 30 years. And that would be an exemplar of somebody that, you know, and we came in and did therapy on her or whatever. I mean, I don't know. Our position, it would be their burden given the testimony. But isn't that, I mean, how I get the feeling that Mr. Jones is saying that's just overwhelming to try to go through, you know, every patient and bring them in and they're homebound. Anyway, bring them in by deposition or I don't know what you do with them. Actually not homebound, Your Honor. Well, okay. Their theory is they are. Bring them in by affidavit or whatever the right approach is and say, you know, yeah, I was there and I got therapy and, you know, it's hard for me to leave the house or whatever the standard is. And I got my therapy and it was lovely. They have to do that for 10 million, 10.2 million dollars worth of services to get this down below the threshold for the 20 point. When the evidence of fraud is so pervasive and we have so much record evidence that that is the way this home health agency did business, yes, it is their burden in those circumstances. We had, the government. That's what they would have to show, that 10.2 million dollars was legitimate out of the 17.1 to get it past the 20 level enhancement. That's what they would have to do, but given the record as it stands, the pervasive fraud, that is their burden in these. Now, could they have extrapolated? They bring in a couple of frail ladies who got therapy and say, look, and because y'all extrapolated from four unfrail ladies. We did not extrapolate from four. We extrapolated from the many witnesses that testified, who knew how the system worked, who said fraud is the way we did business. Fraud was the business model. This is how we did it. So we had some examples, but the crucial evidence is Mary Johnson saying, this is what happened. I would go recruit people. I didn't pay any attention to whether they were homebound or not. And they were, as long as they had a valid Medicare number, they became a patient. And Ayanna Alvarez absolutely saying, this is how we did business. So in those circumstances, yes, it was their burden. The sentences calculations were actually quite modest. There was only $9.2 million in restitution or, I'm sorry, I'm not sure if it was forfeiture or restitution, but I just mean to say that there were limitations that the government also put on the evidence. So they were never subjected to the $17.1 million in other sentencing matters. And it doesn't matter for the offense level, whether it was $7 million or $17.1 million, she certainly was responsible for the 20-level offense level. Why did she get such a large downward variance? Your Honor, I wasn't there at sentencing, so I feel like that's an atmospheric thing that maybe the trial prosecutors would know better. It's been a heck of an atmosphere. Well, the district court did say that he thought that she was less involved than some of the other players. There was some evidence that sometimes she was out of town. Sometimes she was working as a nurse anesthesiologist doing other things. So I think that he took that into account. I just wanted to answer one factual question about the Womack investigation. It is very much active and ongoing. Unless there are further questions, we will rest on our brief. Okay. I think we're good. Thank you, ma'am. The notion that Mr. Ade brought up the Womack issue is not correct. The Womack issue was brought up by the government when they were examining Mary Johnson, who said that Mr. Womack was paid on a per-patient basis, and that Mr. Womack himself said that Mr. Ade had hired him. So to say that Mr. Ade would not be allowed to get on the stand and deny that without opening the door to this murder stuff is not correct. What about the idea that he blurted it out first by talking about Pfizer accusing him of the murder? Well, he said that Pfizer said that the defendants... Okay. Well, and he a defendant? Yes, he was a defendant, as were other people. So what about the argument that he sort of brought it up first? Because he didn't bring it up first. That's why. The government brought... The government already got permission. Okay, but what's the sequence? The sequence is he blurts that out before the jury ever hears about the murder? He blurts that out? Before the word murder comes up, yes. But the word murder is your whole thing. But the government... You don't doubt that they can be told that Womack died. I don't at all. I don't at all. But the government says, in this hotly contested, objected to hearing, I'm going to tell the jury what happened to Mr. Womack. And that was following a sequence of, you know, this happened, this happened, this happened, this happened. And lo and behold, this is what happened to Mr. Womack. What do you do with all this other evidence? I mean, I think we pretty much... If you look... Clear where you stand on the Womack matter. There's no question. What do you do with all this other evidence? There is no question that the evidence of fraud is overwhelming. The question is, is Mr. Age guilty of fraud? If you look at all the sites, the government does a wonderful job of laying out the evidence in this case. But if you look at their sites, they actually put the... In addition to the record page, they put the testimony... Who's giving that testimony? We got the daughter testifying. I mean, she's turned. We got this evidence about the, you know, the daddy wanted to throw the daughter under the bus to take the wrap on it. The daughter changed her mind and says, Daddy, dear, I can't do that. So, the daughter testifies and just throws them both under and, you know, goes on forever about this whole scheme and all that kind of stuff. So, moral of the story, there's some things daughters will do for you and some things they won't. And so, you know, I mean, not being facetious, but the jury's hearing from an insider, you know, who's part of the scheme. We get your point about Womack, but I just want you not to give up the point about the potency of the Womack, but at least let us hear what your view is and why the jury can't accept all of that. And so, if we say, yeah, it was not the smartest thing for the government to do the Womack thing, but the overwhelming... Do you deny or do you take a position there is not overwhelming evidence linking Mr. H? Is that the argument you make? That is my argument. And... But more specifically, the argument is that this evidence that you describe is credibility and I have cited cases, Possum v. Blackman, Testimony v. Verdi, all those cases say that if the error goes to affecting the credibility of the defendant, then you can never say that a trial based on credibility is going to be harmless. And that is our position. Thank you. Thank you, sir. Mr. Jones? It was the credibility of Iona Age which carried this case. Mr. Age testified with a story that it was equally as plausible as an explanation of the events. And I want to go straight to the fact that the government audits Medicare and has an entire mechanism in place to make sure that the kinds of things that Iona Age described did not happen on a large-scale basis. None of that evidence was produced. They say that there's evidence of pervasive fraud, but the pervasive fraud evidence is solely the testimony of Iona Age, and that is all. This was not the case like the Hebron case where they had... If the jury believed her, though, why isn't that enough? The jury apparently believed her. Right. She was the daughter. She was the decider. So, I mean, she's pretty... If the jury believed her, I'm just saying why isn't that enough? I'm certainly aware that nowadays we will believe a denial from no one but a confession from anybody, and Iona Age came on the stand and said, I confess, I did it, and Daddy told me to do it, and the jury believed that. But going to the evidence of such pervasive fraud, the kind that supports this $17 million thing, that was not her testimony. She testified that there was some fraud here. But what I'm trying to suggest to the court is that her testimony alone should not be sufficient to find the $17 million, the evidence of pervasive fraud, like was in the Hebron case where they started making up things out of whole cloth. All right. Good point. I mean, I got you there. Now, the government, when she was up, said, though, if we look at record at page 5413, the Alvarez testimony, and then also Agent Casey's testimony, which presumably Agent Casey is sort of laying out the whole deal here. So I got you as far as what you said about Iona, but it struck me that Agent Casey kind of lays out for the jury the whole scheme, et cetera, et cetera. What are you saying about his testimony in terms of the whole lost piece? Agent Casey was the man who did the extrapolation, Your Honor. He interviewed the 40 or 50 people. He said that based on his interviews, he would extrapolate that most of the cases were not homebound. This was not that they were getting people who didn't get services at all, remember? This isn't sort of an upcoding case where they say that the South Louisiana Home Health made people appear to be sicker than they actually were. But even Agent Casey says, I looked at 40 cases. I looked at 50 cases. Out of the 50 cases, I found a whole bunch. I don't think he gave a number. He said, I found a bunch of them that led me to believe that there were a lot more out there, and that's all. The government has at its disposal all of the year's worth of audit mechanism and that kind of evidence that should have been brought or could have been brought to show that there was pervasive fraud here. Other than the testimony of Agent Casey and Ion A. That's like saying, if you had audited me more frequently, you could have kept me from stealing as much as I stole. I mean, there's no doubt to get to the bouts here, the government wasn't auditing the program, but to say that they didn't come in and audit as frequently, you should have protected me. That's the opposite of my point, Judge Stewart. I'm saying that the government did come in and audit on a frequent basis, and the frequency of the government's audits would support our position that there was no extensive and pervasive fraud here, because this did not come from any of the annual or semi-annual or however they do it. It didn't come from that. One last question, Agent. Presumably, Agent Casey was cross-examined extensively about this matter of the laws. Is there in the record reams or volumes of records or documents that are in the record that he based his extrapolation on or other paperwork that's in the . . . I should say paperwork, disc, whatever that's in this record, were we of a mind to go there, or was it just he looked at something, he's got a chart up, he's extrapolating? Do you follow my question? I believe I do, sir. It's basically that he's got a chart from which he's extrapolating. I think that there is claims data that was introduced in Globo into the file as one of the exhibits, and to be candid with you, no one in the course of the trial pulled out that exhibit and started looking at what was actually in there. It was just simply the testimony from the chart. Okay, all right. Yeah, yeah. Hang on, Mr. Jones. Just in general, can you point to a specific element of either the healthcare fraud conspiracy or the illegal kickback conspiracy that the government did not prove? Well . . . Because we're focusing on restitution, but those elements of conspiracy, you don't necessarily need an overt act, and it seems like that's what we're eliciting. What specific element, or can you point to any, that they did not prove? I don't think they proved the case for a conspiracy because I don't think they had the case for an agreement and an actual participation on the part of Verna Age. I do recognize what the cases say, that all conspiracy requires is an agreement. If you got somebody saying, even though it's somebody saying it to get out of punishment themselves, there was an agreement, and I was in it, and he was in it, and she was in it, I suppose that under the applicable legal standard, that may be considered proof. I know that the court has got to accept and look at things in life most favorably to the government. Specific answer to your question, Judge Brown? No, I don't think they proved it, but I'm not the opinion that counts. All right. Thank you, Mr. Jones. Mr. Averly, you are court-appointed, and we appreciate your service handling this case on the brief and oral argument, as well as all the court-appointed work that you've done for the court over the course of things. Thank you both. Thank you for the argument, Mr. Jones, and counsel of the government. It's a hefty case, but we'll look closely at it and decide it once we finish. Thank you. All right.